Good morning, Your Honours. May it please the Court, my name is Dana Moss and I represent the petitioner, Mr. Faustin Mukati Ilunga. The IJ and the BIA made several errors in this case, as we have extensively briefed in our papers. I'd like to focus my time today on three of the most egregious errors. One, the IJ discredited Mr. Ilunga's testimony based on discrepancies that simply did not exist. Two, the agency failed to consider testimony and documentary evidence that corroborated Mr. Ilunga's testimony. And three, there was no meaningful consideration whatsoever of Mr. Ilunga's well-founded fear of future persecution or his cap claim. Turning first to the inconsistencies. The inconsistencies cited by the IJ are misstatements of the record. The IJ's finding regarding Mr. Ilunga's prayer habits was error because the testimony of Mr. Ilunga on pages 652 and 653 of the record are absolutely consistent with the witness's testimony on pages 664 to 665 of the record. So the prayer inconsistencies simply are wrong. The IJ's finding regarding Mr. Ilunga's MLC documents was error because the IJ there improperly assumed that foreign officials should have drafted the membership card and the MLC letter differently. The IJ speculated that the foreign officials in the Congo should have included information about Mr. Ilunga's past arrests. And as this court held in Tassi, the court in Tassi rejected that exact reasoning and said that the IJ improperly speculated and the court should do the same here. There was no finding whatsoever that the membership card or the membership letter was fraudulent. There was no indication that Mr. Ilunga knew that it was fraudulent in some way. So the actions of foreign officials simply cannot go towards Mr. Ilunga's credibility. And lastly, the IJ's finding regarding Mr. Ilunga's abuse was error because the IJ there fixated on an isolated snippet of the record that dealt specifically with where Mr. Ilunga was whipped. That testimony did not relate to the other four forms of abuse that Mr. Ilunga described. He was stabbed, he was burned with battery acid, he was shocked with an electrified baton, he was raped, and he was also whipped. The testimony at pages 640 to 647 of the record deals specifically with Mr. Ilunga's whipping. So the error of the IJ was that she took that isolated snippet and associated it with all forms of Mr. Ilunga's torture and held that to be an inconsistency that led her to discredit everything that Mr. Ilunga said about his abuse. This court has repeatedly held that the IJ cannot make rulings based on inaccurate perceptions of the record, and for that reason the inconsistencies were error and should be reversed. Now the second central error that the agency made was that the agency improperly rejected or flat out ignored a wealth of corroborating evidence. This court has held that the IJ cannot cherry pick facts that support the adverse credibility finding while ignoring other consistent details. Here, there is an overwhelming amount of consistency. Mr. Ilunga testified for three hours. His transcript spans 75 pages. His testimony spans 75 pages of the transcript. He testified consistently about his political activity, the date of his arrest, the length of his detention, the conditions under which he was detained, and details about his escape. And the IJ mentions none of those consistent details. All of that consistency should have been considered and analyzed in finding Mr. Ilunga's testimony incredible. Now even if we were to assume that the IJ's adverse credibility determination was correct, Mr. Ilunga can still establish his eligibility for asylum based on independent evidence. And here, the most glaring omission is that the BIA does not even mention the country report. More than 450 pages were submitted from the Department of State, from Amnesty International, and other human rights organizations, and the BIA did not cite one page. There is significant evidence in those country reports that Mr. Ilunga was abused, that his abuse is consistent with abuse that happens throughout the Congo to other people who had the same political opinion, which was that they opposed the president, who is still the president today. This court held in Karuma that this exact reason was enough to reverse, that where the IJ and the BIA completely failed to even consider the country reports. And in Karuma, the court said that it's not enough to simply say we considered all the evidence and it was admitted into evidence. There must be some meaningful consideration of Mr. Ilunga's corroborative evidence, such as the country reports, the medical affidavit, which was improperly rejected, the membership documents that were improperly rejected, and the IJ simply did not consider that important corroborative evidence. The third reversible error is that even aside from the adverse credibility determination, there is no discussion whatsoever about Mr. Ilunga's well-founded fear of future persecution. So even if we take it as true that Mr. Ilunga failed to establish past persecution, the task for asylum requires the court to analyze whether Mr. Ilunga established past persecution or a fear of future persecution. There is no discussion whatsoever about a well-founded fear. And that in and of itself is enough to send this case back. The other error, the other legal error, which is significant, is that the BIA concluded in one sentence that the CAT claim was properly dismissed. No analysis whatsoever, just one conclusory sentence with no analysis. Well, given the ruling, the prior ruling, that would be understood, right? Because the CAT claim would be a much more onerous standard. I mean, that wouldn't be unusual, would it? Your Honor, it is unusual because this court has held it where there needs to be some meaningful analysis. In camera, for example, the BIA or the IJ held the exact same language or found the exact same language and said the petitioner, the applicant, failed to establish that it's more likely than not. Just simply restated the test like the IJ did here. And in camera, the court said that's not enough. There needs to be some meaningful analysis of the CAT claim because it's different than the analysis for asylum or withholding. There's no nexus requirement. Whether or not Mr. Ilunga was tortured had nothing to do with his political opinion. And so even if the IJ had appropriately discredited Mr. Ilunga's political opinion, there's no analysis why he didn't satisfy the burden for his CAT claim. When the BIA order clearly does not demonstrate that the agency considered an issue at all, then the proper course is to remand for additional investigation or explanation. And I think it's important to point out here that the government did not even respond to these arguments regarding well-founded fear, imputed political opinion, and the CAT claim argument. It's not even addressed in the brief below. And for that reason, they've waived any argument that they have now. Did Mr. Ilunga raise imputed political opinion to the IJ or to the BIA? Your Honor, more generally, he did. The way it was phrased below is that it was not a consideration of well-founded fear. And this is admittedly more narrow, seeing that in addition to not considering well-founded fear that the IJ should have, the proper test is that the IJ should have considered imputed political opinion. And it's also important to note that the government did not object at all. So even if the court construes it as a slightly different issue than what was raised with the BIA, the court does have the discretion to hear this issue where the government has not objected. Unless there are any further questions, I'll reserve the remainder of my time for rebuttal. All right. Thank you. Ms. By? Good morning. May it please the Court? Catherine By on behalf of the United States Attorney General. This petition for review should be denied because the record does not compel the conclusion that Ilunga was a credible witness in support of his asylum claim. Substantial evidence supports the agency's determinations where Ilunga's claim, especially when compared with that of his sole witness, Kalala, is utterly irreconcilable. Most importantly, the agency was left wondering and simply just could not discern whether Ilunga was beaten or, in whatever form, inside his cell or somewhere else, or whether his sole witness actually saw any of the abuse occur. It doesn't make a big difference. I mean, he got beat. He was beaten. It doesn't matter where. Well, it does make a difference.  This is sort of the crux of his claim. His claim is that he was a political activist and was harassed and eventually arrested and detained because of these political activities. And his whole claim of past persecution and even torture rests on this instance of being detained. And he put forth a witness to ostensibly corroborate his story, this witness. He met him in the jail. According to his story, they escaped together and they lived together in the United States. And he put him on the stand to corroborate his story, and that's where their stories completely fall apart. They said completely different things, even when asked in so many ways by their own attorney that the immigration judge sustained objections about how many times it had been asked and answered. So this is material to his claim because it's the heart of his claim, which doesn't – I mean, this is a Real ID Act case, so we don't even need to say. It could be any inconsistency or contradiction in the record would support an adverse credibility finding. But here, it's actually the whole basis of his claim. So we would argue that that alone would be enough to sustain CIJ's findings. And what was the particularity that was so material that made it utterly incredible? Well, Alunga was asked in many ways where exactly this abuse happened, and he consistently testified that it was within this 10-foot cell – or that it was not within this 10-foot cell, that he was systematically removed daily for – whatever abuse was happening, it happened elsewhere. It never, ever happened inside this room. He was taken to a different part of the jail, and his cellmate says, absolutely, adamantly, it happened inside. He was there. He saw it happen. And there's no translation error that could excuse whether the witness actually saw what happened or didn't. And the fact that both Alunga and Kalala were so specific, so adamant, no matter – these questions were asked in numerous ways to sort of elicit – But both said he was beaten. Yes. Both said he was beaten. So the difference in the case is where it occurred. But isn't there a problem with translation in this case? It's not, because although they make – they point sort of to the definition of cellule and chambra as sort of like maybe there was a problem with understanding whether it was a room or cell or what a cell actually is. And I think it's very clear on the record that the way these questions were asked, you know, rephrased and rephrased as basically that do you mean the actual room where you slept or were you removed from the actual room where you slept? Was it the 10-foot room where you shared or not? And Alunga time and again says, no, I was removed. It never happened in front of Kalala, and it never happened in that room. I was taken to a different place. And so he was given the opportunity to explain the difference between chambra and cellule both on direct, on cross, and on redirect. And he consistently said that it was within the bigger prison, that although he had in the beginning mistaken and sort of conflated those two words, he was given the opportunity to explain that it was somewhere else outside of his actual – what we would understand as a cell. That testimony wasn't the sole basis of his claim, as I think you've said a couple times now. It was what the IJ focused on, but there was the MLC membership card and letter. There were the photographs of the injuries, the medical affidavit, the photographs of the burned house of his wife, all things that arguably the IJ completely ignored or discounted and instead cherry-picked this inconsistency. I think that's sort of a misguided way to look at the record. I think that the IJ did heavily focus on this discrepancy, which the IJ was entitled to do. I mean, any discrepancy can support an adverse credibility finding, and this was particularly egregious because it was so specific and so adamantly described and so irreconcilable between the two. The IJ didn't completely discredit the rest of the evidence, but just said basically in light of how inconsistent this testimony was and then sort of looking at the other things, it was basically that the rest of the documentary evidence didn't otherwise corroborate his claim. So what the IJ was left with and what the board agreed with the IJ on is that there was no way to sort of extricate the documentary evidence from the rest of his claim, and under a totality of circumstances, they found him incredible because there was no way to sort of parse this out. So just the same way that the IJ can't cherry-pick certain things to make him incredible, the burden now is to show not that there's a plausible other explanation or some other way of looking at it. The IJ was entitled to determine which documents held how much evidentiary weight and was able to decide that some of these documents didn't corroborate his otherwise incredible claim. And basically what the IJ was left with was the whole claim was discredited based on the credibility, but even that aside, what you would be left with is country reports saying arguably, absolutely, that this is not a fabulous place to be and terrible human rights violations are occurring, but there was nothing that independently corroborated his claim. Now the country reports were consistent with this type of activity being quite frequent, this kind of beatings, correct? Correct. So the macro was consistent with his micro-testimony of what happened to him, correct? Correct. And you said in a sense, because one time, didn't his witness say, I was there? The translation was, he said, I was there as opposed to I saw in terms of literal translation. For example, if I'm in the cell with you and they take you to another place and beat you unmercifully and you come back and I see bleeding and stuff, and they say, well, were you, did you, were you, yeah, I was there, yeah, there. I saw him come back bleeding and bloody and bludgeoned. But not technically, oh, yeah, I was in the room, because did he give any testimony that was detailed, like what he saw, like I saw the first blow was they hit him in the face and then the next blow he fell. It was that I was there. Didn't he say that, basically? Well, first of all, he didn't give that explanation to the IJ or below. So this is a new explanation that has not been presented to the agency. But regardless, any version of sort of a there-ness doesn't explain whether he actually saw it. And he was asked again and again, did you see it? Did the actual abuse happen inside this room? Did you see it with your own two eyes? I mean, I'm a little bit paraphrasing here. But was it in this room where you spent your nights? And whereas Alunga continually said, no, we were systematically taken out of the room, gone somewhere else. And the explanation now is that sort of, oh, maybe some happened somewhere, some happened in another place. But that explanation was not presented to the agency, nor is this sort of explanation of there-ness. The documents that Judge Sackett went over with you a few minutes ago, why don't those independently corroborate the claim? And so where the meeting took place, there might be some error there. But there are other documents that independently corroborate it. Well, like what specifically? I mean, the documents don't – the documents kind of – Like the medical affidavit. Photographs. And photographs. Well, those show that he has some scars, some remaining scars. The medical affidavit was an American doctor, you know, taken after the fact. And it says basically that, you know, his story is consistent with what – With the physical findings. Right. I think it's the medical examination and the physical findings that his story is consistent. That's the definition of corroboration almost. It is. But the IJ was entitled to find that his testimony being so utterly irreconcilable with that of his witness that it didn't overcome the problems that she found in his testimony. And I would also like to just point out that the IJ and the Board were not – The IJ said that the medical affidavit, quote, did not prove what caused the medical issues noted. What possibly then could prove the medical issues noted, if not an examination by an independent physician who says that the injuries are consistent with the torture that was described? Well, I mean, the agency didn't go into detail about it and didn't actually, you know, say, you know, this particular thing is fine, this particular thing is not. It could be a doctor that was there then in the cell and saw it. Possibly. But even if that was improperly discredited, it still doesn't necessarily take away from the overall adverse credibility finding, which was based on a totality of circumstances. And further, the petitioner argues now that we should have reached the merits of the underlying claim, meaning, you know, adverse credibility aside, that the IJ was required to look at the well-founded fear. And in fact, the IJ rejected the whole claim based on the adverse credibility and was not required to find – to do anything on the well-founded fear, which is separate from CAT. If the adverse credibility finding doesn't stand, the case needs to return to the Board for further fact-finding on past prosecution and well-founded fear. So if there are no further questions. Thank you so much. Anything further, Ms. Wall? Okay. Your Honors, I'd just like to make one strong point here that the Court raised, and that is in which the government concedes it's accepted as true that Mr. Alunga was beaten. That is the critical fact here. If there's any difference, the only minor difference is where that abuse may have happened. And I might add that abuse is limited to Mr. Alunga's whippings. I think that Chang v. Holder, Ninth Circuit case is very instructive here, where the Ninth Circuit held that where Mr. Chang was beaten on his body, whether it was his neck or his shoulder, that difference was so minor that it could not possibly support an adverse credibility finding because the important point was that Mr. Chang was beaten. And the same holds true here. Mr. Alunga was beaten. The government concedes that none of the other evidence was discredited specifically by the IJ, and all of that should have been considered. We are talking about two victims here who sustained abuse, who Mr. Alunga has PTSD. He was in a cell for two months with no food, no water, no light. His witness was subjected to the same conditions for seven months. The standard cannot possibly be perfect recall when there is this wealth of evidence that is consistent and corroborates not only past persecution and fear of future persecution. This court said in Tosse, those who flee persecution and seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate. And unfortunately, that did not happen here. And for those reasons, Mr. Alunga respectfully asked the court to grant the petition. What do you want? Your Honor, we want the court to find that past persecution was established. There is enough on this record to show that, without a doubt, Mr. Alunga established past persecution or a well-founded fear of future persecution. And so we would ask that the BIA be required to enter a decision consistent with that. At the very least, we'd ask that it would be remanded to be properly considered and have the evidence properly weighed. Thank you, counsel. Thank you, Your Honor.
judges: Roger L. Gregory, Henry F. Floyd, Stephanie D. Thacker